

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KIM A. BROWDER,⟩
⟩
        Plaintiff,⟩
⟩
v.⟩        CIVIL ACTION NO.
⟩        02-AR-2395-S
⟩
AMSOUTH BANK, N.A.,⟩
⟩
        Defendant.⟩

**FILED**

03 OCT 27 PM 1:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**ENTERED**
OCT 2 7 2003

### MEMORANDUM OPINION

Before the court are a motion for summary judgment and a motion to strike filed by defendant, AmSouth Bank, N.A. ("AmSouth"). Plaintiff, Kim A. Browder ("Browder"), brings claims against AmSouth for race and sex discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), disability discrimination pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and violations of the Family Medical Leave Act ("FMLA"). AmSouth seeks summary judgment on all of Browder's claims and to strike the unsupported factual averments in Browder's response.

### Statement of Undisputed Facts

Browder, a black female, began working for AmSouth as a marketing clerk on January 21, 1992. AmSouth transferred her to its Direct Loan Center ("DLC") on March 10, 1999. There, she became an underwriter assigned to AmSouth's Central Alabama

1

region, its smallest region.  As an underwriter Browder reviewed potential customers' credit reports, payment history, and relationship with AmSouth to determine whether to grant loan requests.  A large part of her job involved taking calls from AmSouth branch employees to discuss loan applications.  If she failed to answer a call the call would roll to the senior underwriter and then to any other underwriter on the team.

Initially, Bill Wilburn was Browder's Senior Underwriter. Between five and six months after her transfer, John Corey, a white male, replaced Wilburn.  Under Corey, Browder received two written warnings for attendance problems.  The first, on July 7, 2000, concerned two unexcused absences Browder had in June 2000. On August 29, 2000, Corey issued Browder a final "Attendance Warning."  AmSouth policy was to terminate an employee for an unexcused absence subsequent to the final warning.

AmSouth promoted Corey to DLC Manager in Fall 2000, and Jayme Lartigue, a white male, replaced Corey as the Senior Underwriter over Browder.  Browder alleges that she was first subjected to employment discrimination when Lartigue became her supervisor.  Lartigue was the Senior Underwriter and Corey the DLC Manager when Browder was fired on February 26, 2002.

Around February 6, 2001, Browder took maternity leave for her first pregnancy.  Before taking her maternity leave, Browder and Lartigue discussed Browder's dissatisfaction with working the

2

smallest region.  Browder's child was born on February 15, 2001,
and she returned to work on April 26, 2001.  Upon her return,
Browder received her calendar-year 2000 evaluation.  She was
shown to be performing at expected levels and meeting most
performance measures.  The evaluation stated, however, that
Browder needed improvement in the category of Quality Service
Performance and that she had the lowest number of loan
completions for the year.  Lartigue noted in the supervisor's
assessment that Browder needed to improve in "loan volume,
teamwork, punctuality and attendance."  Browder stated her belief
that working the smallest region adversely effected her loan
volume and that she would prefer a larger region if possible.

     In accordance with Browder's prior request, Lartigue
reassigned her to AmSouth's Louisiana region and reassigned Chris
Todd, a white male, to the Central Alabama region.  Todd
complained about the reassignment because his loan volume
decreased.  Lartigue then combined the two territories -- Central
Alabama and Louisiana -- into a single territory and assigned
both Browder and Todd to it.  During Summer 2001, Browder again
had the lowest number of loan completions.

     On August 9, 2001, Browder was issued a "FINAL WRITTEN
WARNING" for her workplace behavior.  In the weeks leading up to
this warning, fellow employees complained that Browder was
disrupting their work and changing phone settings so that calls

to Browder would immediately roll to other employees without Lartigue's knowledge.  Additionally, Browder had made threatening remarks directed at Corey and Lartigue.  The warning states: "Any further displays of inappropriate/ unacceptable behavior or violations of company policy will result in your immediate termination."

One month later, Browder filed for leave under the FMLA for her second pregnancy.  Although the form allows leave for "a serious health condition, including pregnancy related absences," this was not the stated reason for the leave request.  The form expressly recognizes the leave event to be "the birth of your child."  It recognizes that Browder's leave will begin on April 21, 2002[1] and continue for "up to 12 weeks."  In accordance with AmSouth's request, Browder submitted  medical certification for her leave on or about October 22, 2001.  She also signed the FMLA form at that time.  The certification verified Browder's pregnancy and indicated she would need leave for "Regular Obstetrical Visits," "Approximately 6 to 8 weeks post-partum," and "as needed by the patient."  Except for the 6 to 8 weeks post-partum, the certification indicated that Browder could perform her essential job functions.

---

[1]   The form misstates the date leave is to begin as "April 21, 2001," but it is undisputed that Browder's child was due on April 21, **2002**, not 2001.  If Browder were being approved for "up to 12 weeks" of leave following April 21, 2001, her leave would have expired in July 2001 -- two months before she even requested the leave.

Browder's doctor also suggested that she arrange for handicapped parking.  On September 12, 2000, Browder had applied for and received a handicapped decal for her first pregnancy, but it expired "60 days beyond the approval date."  Although she knew how to obtain a new decal, she began parking in handicapped-designated spaces without filing the required paperwork. Lartigue told her she needed a current decal to park in those spaces, but Browder persisted.[2]  She finally requested a new decal after a performance update on November 20, 2001 in which she was cited for parking in handicapped spaces without proper authorization.  C.B. Richard Ellis, Inc., the management company for the building that the DLC was located in, issued Browder an unexpired decal for her second pregnancy after receiving her registration form.

The November 2001 performance update saw no real improvement in Browder, she "continued to fail to meet [] expectations." Although Browder was the second-lowest performer in loan volume for October 2001, she had been the lowest performer in August and September 2001.  Similarly, complaints from other employees that Browder was "visiting and disrupting their work" had persisted. She was still away from her "work area for long periods of time"

---

[2]   In her deposition, Browder claimed to have received verbal permission to park in the handicapped spaces from a parking attendant. However, she admitted never having told Lartigue or Corey of the verbal permission.

and when at her desk was not answering calls.  She was not fired
at that time, but the update concluded: "We expect immediate and
continued improvement of your performance.  Failure to meet the
expectations of your position or violation of any company policy
will result in your termination."

Despite this update, Browder's performance continued to
decline.  For the three consecutive months immediately following
the update -- December 2001, January 2002, and February 2002 --
Browder was again the lowest ranked underwriter in the DLC's
performance rankings.[3]  AmSouth fired Browder on February 26,
2002.  She was seven month pregnant.

The next day, Browder filed charges with the Equal
Employment Opportunity Commission ("EEOC").  In the section of
the charge titled "CAUSE OF DISCRIMINATION BASED ON," Browder
checked only the "RACE" and "SEX" boxes.  She did not check
"DISABILITY," "RETALIATION," or any other specific cause.  She
described the discrimination:

> I.   I was hired by the above employer in January 1992
>      as a Marketing Clerk.  Since August 2000, I have
>      been subjected to disparate terms and conditions
>      of employment with respect to being allowed to
>      speak to coworkers, use of telephone, taking as
>      well as making up leave for doctor appointments

---

[3]  Browder claims in her response brief that she "continued to
work the largest number of applications."  The performance rankings,
however, do not show Browder to have worked 12 application in January
2002 and February 2002.  They show that Browder was ranked 12th out of
12 underwriters for those months.  Likewise, she was ranked 13th out of
13 underwriters in portfolio delinquency category (the only category
in which underwriter Carrie participates) for both months.

and other conditions of employment.  I have
received unfair disciplinary actions for things
that other employees have not.  I was discharged
on February 26, 2002.

II.   The reason given for the discharge was
unsatisfactory performance, according to John
Corey, Department Manager.

III.  I believe I have been discriminated against
because of my race, Black, my sex, female, and my
sex, female due to pregnancy, in violation of
Title VII of the Civil Rights Act of 1964, as
amended, in that White employees and male
employees have not been subjected to the treatment
I received.

The EEOC issued Browder a right-to-sue on June 28, 2002 and she

filed this action on September 30, 2002.[4]

### Standard of Review

Rule 56, F.R.Civ.P., provides that summary judgment is

proper when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment

as a matter of law."  In deciding a summary-judgment motion, the

court must view all the evidence and any reasonable factual

inferences in the light most favorable to the nonmoving party.

*Lowe's Home Centers, Inc. v. Olin Corp.*, 313 F.3d 1307, 1310

(11th Cir. 2002).  Once the moving party has met its burden, the

---

[4]   Browder filed the complaint as an emergency filing on
Saturday, June 28, 2002.  She failed to show cause for the emergency
filing and the court deemed the complaint filed on Monday, June 30,
2002.  (Doc. #3, #5, & #7).

nonmoving party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial with regard to those dispositive matters for which it carries the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Accordingly, viewing evidence in the light most favorable to the nonmoving party, does not mean that the court is constrained to accept all of nonmovant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir. 1994). The nonmovant is given the benefit of every *reasonable* inference, not every metaphysical doubt. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## Analysis

### I.   Title VII & ADA Claims

Title VII makes it unlawful for an employer "to discriminate against any individual ..., *because of* such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)(emphasis added). Similarly, the ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such person." 42 U.S.C. § 12112(a). Whether race, sex, or disability motivated an employment decision in "mixed-motive" cases, *i.e.*, where both legitimate and illegitimate reasons may have motivated the decision, requires application of the *McDonnell Douglas* burden-shifting analysis.

8

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Hilburn v. Murata Elec. N.A., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) (holding that the Title VII burden-shifting analysis is "equally applicable to ADA claims."). Under the *McDonnell Douglas* framework, Browder must first raise an inference of discrimination by establishing a *prima facie* case. *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir. 1994). Once Browder establishes a *prima facie* case, the burden shifts, and AmSouth must proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). Even then, Browder can survive summary judgment by proffering evidence "to permit a reasonable fact finder to conclude that the employer's proffered non-discriminatory reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

As an initial matter, a plaintiff's complaint is restricted in scope to the alleged discrimination before the EEOC, and claims that can reasonably be expected to grow out of those allegations. *See Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n. 8 (11th Cir.1994) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970)), *accord Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir.1985). Alleged violations of Title VII and the ADA can only be brought if they have been made the

subject of a timely-filed EEOC charge.  *See generally* 42 U.S.C.
§§ 2000e-5, 12117.  EEOC regulations provide that charges should
contain, among other things, "[a] clear and concise statement of
the facts, including pertinent dates, constituting the alleged
unlawful employment practices." 29 C.F.R. § 1601.12(a)(3).
Unless the claims in the complaint grow out of the charges before
the EEOC, the claims are barred for failure to exhaust available
administrative remedies.

    **A.  *Disability Due to Pregnancy***

    Browder's disability claims cannot be said to grow out of
her EEOC charge -- no ADA allegations appear in it.  Browder's
EEOC charge states that she was discriminated against because of
her race and her "sex, female, and [her] sex, female due to
pregnancy, **in violation of Title VII of the Civil Rights Act of
1964.**"  (emphasis added).  Her written charge does not include an
ADA claim or any reference to the ADA.  In the section of the
charge entitled "CAUSE OF DISCRIMINATION BASED ON," she only
checked the "RACE" and "SEX" boxes.  Browder left the
"DISABILITY" box and every other box blank.  Disability claims do
not reasonably grow out of the EEOC charge Browder filed.

    Even if Browder had exhausted her administrative remedies,
her claim is fundamentally flawed.  Browder argues that her
disability is pregnancy.  The majority of courts do not recognize
pregnancy and its complications to be a disability.   *Wenzlaff v.*

10

*Nationsbank*, 940 F. Supp. 899 (D.Md. 1996) (stating that "[w]ith
near unanimity, federal courts have held that pregnancy is not a
'disability' under the ADA."); *see also Gover v. Speedway Super
America, LLC*, 254 F. Supp. 2d 695, 704 (S.D.Ohio 2002) (holding
pregnancy not a disability); *Farrell v. Time Service, Inc.*, 178
F.Supp.2d 1295, 1298 (N.D.Ga. 2001) (holding that "[i]t is
clearly established that pregnancy *per se* does not constitute a
disability under federal law."); *Johnson v. A.P. Products, Ltd.*,
834 F. Supp. 625 (S.D.N.Y. 1996) (holding neither plaintiff's
"pregnancy nor its complications are a disability under the
ADA."); *Villarreal v. J.E. Merit Constr., Inc.*, 895 F.Supp. 149,
152 (S.D.Tex.1995) (same); *Gudenkauf v. Stauffer Communications
Inc.*, 922 F.Supp. 465, 474 (D.Kan. 1996) (same).  Because
pregnancy is not a permanent condition, finding pregnancy outside
the definition of disability in the ADA comports with Supreme
Court authority.  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534
U.S. 184 (2002) (holding that to be disabling, the medical
condition causing the limitation of a major life activity must be
permanent, not temporary).  The EEOC has likewise stated, in its
discussion of physical and mental impairments: "Other conditions,
such as pregnancy, that are not the result of a physiological
disorder are also not impairments." 29 C.F.R. § 1630.2(h).

In her response, Browder acknowledges that pregnancy is not
a disability, but asserts that **complications** made her pregnancy

11

come within the disability definition: "[w]hile normal pregnancy
is not a disability in and of itself, her doctor provided her
with medical proof that Browder [*sic*] complications had her
working with a disability." (Doc. #26 at 14). The "medical
proof" of complications which Browder points to is an FMLA leave
form. The form indicates that she is pregnant and will be
incapacitated "approximately 6 to 8 weeks post-partum." No
complications are mentioned. In fact, her doctor indicates that
she will need to be absent intermittently for "**Regular**
**Obstetrical Visits**." (Doc. #27, Ex.3 at 2). AmSouth is
therefore entitled to summary judgment on Browder's ADA claims.

**B.   *Retaliation Claims***

Browder's retaliation claim is likewise absent from her EEOC
charge. Again, Browder only checked the "RACE" and "SEX" boxes
in her charge. She left the "RETALIATION" box blank. The
particulars of the charge also fail to make any mention of
retaliation. Browder specifies that she was "subjected to
**disparate terms and conditions** of employment ... [and] received
**unfair disciplinary actions for things other employees have not**."
(emphasis added). Title VII makes discrimination and retaliation
separate wrongs. *Compare* 42 U.S.C. § 2000e-2(a) *with* 42 U.S.C. §
2000-3(a). More fundamentally, her termination could not have
been retaliatory because she brought her EEOC charge after being
terminated. *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 109 (2d

12

Cir. 1993) (holding reasonably related rule allows judicial
redress for retaliatory acts arising subsequent to an EEOC
filing).  Any other retaliatory event is barred because that
unmentioned event occurred before her EEOC charge and AmSouth is
not on notice of the retaliation claim.  *Heuer v. Weil-McLain, a
Div. of the Marley Co.*, 203 F.3d 1021, 1023 (7th Cir. 2000)
(holding that "a complaint that charges discrimination is deemed
not to place the employer on notice that he is being charged with
retaliation."); *Williams v. Little Rock Mun. Water Works*, 21 F.3d
218, 223 (8th Cir. 1994).  Browder's retaliation claims, like her
disability claims, cannot be said to reasonable grow out of her
EEOC charge.  AmSouth is therefore entitled to summary judgment
on Browder's retaliation claims.

   C.  *Promotion Claims*

   Browder raises for the first time that AmSouth passed her
over for promotion in 1999 and 2000.  These discrete acts were
never raised in Browder's EEOC charge and do not appear in her
complaint.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S.
101, 114 (2002) ("Discrete acts such as termination, failure to
promote, denial of transfer, or refusal to hire are easy to
identify. Each incident of discrimination and each retaliatory
adverse employment decision constitutes a separate actionable
'unlawful employment practice.'").  Because both promotions
occurred more than 180 days before Browder filed her EEOC on

February 27, 2002, they are due to be dismissed.[5]

### D. *Disparate-Treatment Claims*

Browder's remaining Title VII claims are ones for disparate treatment because of her race and sex.[6]  Under *McDonnell Douglas*, a plaintiff establishes a *prima facie* case by showing: (1) she belongs to a protected class; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees outside her protected class more favorably; and (4) she was qualified to do the job.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  It is undisputed that Browder, a black female, belongs to two protected classes.  It is likewise undisputed that Browder suffered an adverse job action when AmSouth fired her on February 26, 2002.  The court first considers the other alleged adverse job actions.

In addition to her termination, Browder alleges that the following adverse job actions constituted sex discrimination: (1)not being allowed to speak to coworkers; (2) discipline for use of the telephone; (3) "taking and making up leave"; (4)

---

[5]  Even if Browder had timely filed these claims, she has presented no evidence on the fourth element of a *prima facie* promotion case -- equally or less qualified.  *See Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir. 1999) (stating the elements of a promotion case). Browder's arguement that "[t]o the best of our knowledge..." is not evidence.

[6]  AmSouth points out that Browder has effectively conceded her disparate-treatment claims because she has made no attempt to rebut the evidence and arguments AmSouth presented in its initial brief. Nevertheless the court has examined Browder's disparate-treatment claims.

denial of closer parking; and (5) denial of reduced hours or
reassignment "with less stressors."  Browder identifies her
assignment to AmSouth's Louisiana and Central Alabama regions as
race and sex discrimination.  These sweeping allegations of
discrimination in her response -- often without record cites or
evidence -- might be useful at trial to prove discriminatory
animus, but Browder must first establish a *prima facie* case.
*Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1332 n.11
(11th Cir. 1998).  The court will examine each allegation.

       The court is again mindful that its jurisdiction under Title
VII requires a plaintiff to timely file charges regarding any
claimed discrimination with the EEOC and receive a notice of
right to sue from the EEOC.  *See* 42 U.S.C. § 2000e- 5(f)(1);
*McDonnell Douglas*, 411 U.S. at 798.  The charge must be filed
with the EEOC within 180 days of the alleged discrimination.  42
U.S.C. § 2000e-5(e).  Failure to do so bars this court from
hearing an action based on the claimed discrimination.  *Everett
v. Cobb County Sch. Dist.*, 138 F.3d 1407, 1410 (11th Cir. 1998).
Browder's EEOC charge makes no mention of AmSouth's "refusal of
accommodation"[7] to provide Browder with "closer parking and

------

       [7]  Although a disability must be accommodated pursuant to the
ADA, Browder has cited no authority for her argument that
accommodations must be made pursuant to Title VII for discrimination
that violates that statute.  The court does not reach this issue
because, as discussed *infra*, there is no evidence that Browder ever
requested the accommodations and these allegedly adverse job actions
were not timely presented to the EEOC.

reduced hours or another assignment with less stressors."
*Response* at 14, 20 (incorporating Browder's FMLA claims into her
**sex** discrimination claims).  Besides being over 180 days old and
missing from Browder's EEOC charge, her claim based on her region
assignment directly contradicts her testimony that she had no
problem with change.  In fact, she requested the change.
Browder's sex and race claim based on failure to promote appears
in neither her EEOC charge nor her complaint filed with the
court.  All of these untimely allegations are due to be
eliminated as a matter for court consideration.  The remaining
allegations require examining what constitutes an adverse job
action.

In *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232 (11th
Cir. 2001, the Eleventh Circuit addressed what constitutes an
adverse job action.  There, an employee had received two
memoranda criticizing him for unacceptable performance and
conduct.  245 F.3d at 1235-36.  He had otherwise received
excellent and satisfactory evaluations.  *Id.* at 1235.  The court
held that an adverse job action is an action that creates a
"serious and material change in the terms and conditions or
privileges of employment."  *Id.* at 1239.  This is an objective
standard, and "the employee's subjective view of the significance
and adversity of the employer's action is not controlling."  *Id.*

In affirming judgment as a matter of law for the employer,

16

the court found significant that Davis had not suffered "any
economic injury," such as a "reduction in salary, loss of
benefits, denial of promotions, workplace reassignments,
transfer, or change in permanent job title." *Davis*, 245 F.3d at
1236, 1240.  The court thought that "[e]xpanding the scope of
Title VII to permit discrimination lawsuits predicated only on
unwelcome day-to-day critiques and assertedly unjustified
negative evaluations would ... limit an employer's ability to
maintain and improve job performance." *Id*. at 1242.  Here, it is
undisputed that Browder did not suffer a salary decrease,
demotion, or any other economic injury until her termination in
February 2002.

The critical evaluations from Lartigue and his insistence
that Browder answer the telephone instead of talking to other
employees are not separate adverse job actions under Title VII.
*Lucas v*. *W. W. Grainger, Inc*., 257 F.3d 1249, 1261 (11th Cir.
2001) (holding that a negative evaluation in and of itself is not
an adverse employment action).  Those actions are the normal
instruction, feedback and evaluation communicated between
employer and employee.  It is undisputed that other employees
complained to Lartigue that Browder was bothering them and that
her failure to answer the telephone resulted in the other
employees, including Lartigue, having to answer calls intended
for Browder.  AmSouth allegedly fired Browder, in part, for

17

failing to comply with Lartigue's instructions.  The feedback itself is not an adverse job action.

Moreover, in order to establish a *prima facie* case, Browder must show that an employee similarly situated to her in all relevant aspects, but outside of her protected class, was treated more favorably.  *Silvera v. Orange County Sch. Bd.*, 244 F. 3d 1253, 1259 (11th Cir. 2001).  There is no evidence that another employee, male, female, black or white, failed to answer a similar number of calls as Browder.  Nor is there any evidence that Lartigue received complaints concerning another employee disrupting workers.  The record is equally devoid of any evidence that another employee was or was not disciplined for conduct similar to Browder's.  AmSouth is therefore entitled to summary judgment on these claims because there is no evidence that employees involved in or accused of the same or similar conduct are disciplined in different ways.  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Browder's discrimination claim for "taking and making up leave" involves an employee who allegedly took a vacation day for car trouble.  Browder alleges that she was not allowed to take a vacation day on one occasion when she had a doctor's appointment. Browder made no attempt in her responsive brief to rebut AmSouth's evidence that Browder's pay was never reduced during the time in question.  More fundamentally, Browder has specified

18

that the similarly situated employee for this ostensibly sex discrimination claim is another female.  Such an employee is in the same protected class as Browder and, consequently, Browder cannot establish a *prima facie* case based on this alleged adverse job action.

There is another problem that Browder created for herself and that she has not overcome, namely, her failure to choose between the two protected classes to which she belongs.  Under Title VII she is obligated to prove that the adverse employment action about which she complains is motivated by animus toward a protected class or classes to which she belongs.  It is, of course, possible to prove intersectional discrimination such as discrimination against the narrow group of black females, but Browder has not made good on any such allegation if that was her intention.  If she intended to allege alternative bases for AmSouth's decision to terminate her, she has failed to offer substantial proof either of her race or of her gender as the reason for her termination.  She cannot leave the defendant and the court guessing.

Even if Browder had not failed to establish a *prima facie* case of her Title VII discrimination claims, she has failed to rebut AmSouth's nondiscriminatory reasons for her termination, discussed *infra* following the discussion of her FMLA retaliation claims.  Accordingly, summary judgment in favor of AmSouth is

19

appropriate on all Browder's Title VII and ADA claims because she
has either failed to exhaust her administrative remedies or
failed to establish a *prima facie* case or failed to show that
AmSouth's proffered reasons are pretextual.

## II.  FMLA Claims

AmSouth also moves for summary judgment on Browder's FMLA
claims.  There are two types of claims a plaintiff can assert
pursuant to the FMLA: (1) interference claims, in which an
employee asserts that the employer denied or otherwise interfered
with substantive rights; and (2) retaliation claims, in which an
employee asserts that the employer discriminated against the
employee for engaging in a protected activity.  *Strickland v.
Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001).
To prevail on an interference claim, an employee need only
demonstrate that the employer denied a benefit due to that
employee.  *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d
1349, 1353-54 (11th Cir. 2000); *King v. Preferred Technical
Group*, 166 F.3d 887, 891 (7th Cir.1999).  To succeed on a
retaliation claim, however, an employee must demonstrate that the
employer took an adverse employment action against the employee
because the employee exercised an FMLA right.  *Strickland*, 239
F.3d at 1207.  The higher burden in retaliation claims requires
that the employee show that the employer's actions "were
motivated by an impermissible retaliatory or discriminatory

20

animus." *Id.* (quoting *King*, 166 F.3d at 891).

### A. *Interference Claims*

Browder alleges that AmSouth interfered with her FMLA rights when another employee viewed her FMLA notification, when she was denied closer parking, and when no alternative position with a reduced workload was provided to her. Browder adds that AmSouth failed to properly inform her of her rights under the FMLA. She has not shown any damage due to these actions.

Browder's pay was never decreased and she has produced no evidence of a request for an accommodation, transfer or reduced workload. Her only FMLA leave request sought up to 12-weeks leave following the birth of her second child. When she was briefly hospitalized in November or December 2001 AmSouth treated her leave as FMLA leave. The medical certification that Browder's doctor provided anticipates additional leave "as needed," but it is not a request for an alternative position or reduced work as Browder argues in her responsive brief. In other words, Browder received all the leave that the evidence demonstrates she requested and she was fully paid for all that leave. Under these circumstances, Browder suffered no FMLA injury. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275 (11th Cir. 1999) (per curiam) (affirming summary judgment when plaintiff suffered no FMLA injury when she received all the leave she requested and was paid for most of the leave).

Although Browder contends that AmSouth violated the FMLA when it denied her closer parking and allowed a nonmanagement employee to view her FMLA request, AmSouth is correct that no substantive right under the FMLA has been violated.  The FMLA does not protect the right to privacy nor does it guarantee closer parking.  Even if closer parking is an accommodation, the evidence shows that Browder did not request closer parking until after she received a written warning in November 2001.  She was then issued a handicapped pass.  Again, at no time did she suffer a reduction in pay or any other tangible injury from these events.

### B.  *Retaliation Claims*

Browder alleges numerous retaliation claims: (1) the switch from AmSouth's Central Alabama region to its Louisiana region following her first pregnancy; (2) allowing a nonmanagement employee to view her FMLA request; (3) denial or closer parking; and (4) firing her on February 26, 2002 because she submitted an FMLA leave request on October 9, 2001.  As is the case under Title VII, a plaintiff must first prove a *prima facie* case of retaliation under the FMLA: (1) plaintiff availed herself of a protected right under the FMLA; (2) plaintiff suffered an adverse job decision; and (3) there is a causal connection between the protected activity and the adverse job decision.  *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001); *Parris v.*

22

*Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000). Like the analysis under Title VII, an adverse job action under the FMLA requires the employee to show a "serious and material change" in the terms and conditions of employment. *Davis*, 245 F.3d at 1239.

Browder has not presented any evidence that she suffered a serious and material change in her employment when her closer parking was denied or when a nonmanagement employee saw her FMLA leave request. Although not having closer parking required Browder to walk a greater distance to get to the building, this was a result of her failure to request a temporary handicapped parking pass. It is undisputed that Browder's pay was not reduced and her job requirements were not altered when she received a written warning for parking in the handicapped spaces without a pass. Nor did another employee seeing her FMLA leave request change her pay or cause her any actionable harm. Browder stated that she thought this action was an invasion of privacy, but that does not make it an adverse job action.

Browder also argues that AmSouth retaliated against her for her first maternity leave by switching her from AmSouth's Central Alabama region to its Louisiana region. The undisputed evidence is that Browder requested the reassignment. It is likewise undisputed that she suffered no change in pay or benefits as a result of the switch. In fact, Browder testified in her

deposition that she had no problem with the switch:

> Q.  When he informed you of this change [in region],
> did he make any negative reference to your having taken
> FMLA leave?
> A.  No.
> Q.  Did you have a problem with the fact that your
> regions were switched?
> A.  No.

(Doc. #19, Ex.1 at 85).  AmSouth's compliance with Browder's
request to switch her to another region is not an adverse job
action.

Browder's request for pregnancy leave and subsequent
termination satisfy the first two elements of a *prima facie* case,
but fail the third.  Close temporal proximity between two events
may support a finding of causal connection.  *See Brungart v.
BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)
(acknowledging the general rule that close temporal proximity
between protected conduct and adverse employment action is
sufficient circumstantial evidence to create a genuine issue of
material fact).  Here, Browder submitted her FMLA leave request
in early October 2001.  She was fired in late February 2002.
Four-and-one-half months, however, does not establish a causal
connection for summary judgment purposes.  *Wascura*, 257 F.3d at
1247 (holding three-and-a-half-month period between notification
and subsequent termination does not, by itself, establish
causation).  Browder has presented no other evidence to support
her claim that her termination was retaliatory.

24

Even if Browder had established a *prima facie* case on one of her retaliation claims, she has presented no evidence to rebut AmSouth's nondiscriminatory reasons for her termination.  Browder had received written warnings for poor job performance and inappropriate behavior in August and November 2001.  Besides not being present in her work area and disrupting other workers, Browder had threatened her supervisors, Lartigue and Corey.  Her attempts to combat these reasons as mere pretext fail.

Browder contends that she had "the highest number of loan applications worked on the team."  *Response* at 21.  She then goes through AmSouth's February 2002 performance rankings to explain that the underwriters ranked first through fourth completed fewer loans in total than her twelve.  Browder argues that her "superior" performance in the month of her termination proves pretext.  However, she was ranked dead last, 12th of 12, for the month of February 2002 -- just as she was in January 2002.  This evidence does not prove pretext, it further substantiates AmSouth's arguments that Browder was performing poorly.

The only other pretext argument Browder makes is similarly flawed.  She claims that underwriter Todd "had less seniority, a higher base salary, and had only a high school diploma."  *Response* at 24.  The evidence Browder provides for this is Todd's 1997 employment application.  It indicates that he was hired as an underwriter on April 7, 1997 -- before Browder -- at a

starting salary of $36,000.00 per year.  Browder's starting salary as a **marketing clerk** in 1992 was only $1300 per month, but she gives no explanation as to why a marketing clerk and an **underwriter** should receive the same salary.  She may have had more seniority at AmSouth, but Todd had more seniority as an underwriter.  Browder's disparate salary argument is meritless to the extent it is not barred by the 180-day statute of limitations.

Summary judgment in favor of AmSouth is due to be granted on Browder's FMLA claims.

### Conclusion

By separate order, the court will grant defendant's motion for summary judgment.

DONE this 27th day of October, 2003.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE